THE PEOPLE *ex rel.* TYRONE C. FAHNER, Attorney General, Plaintiff-Appellant and Cross-Appellee, *v.* THOMAS WALSH *et al.*, Defendants-Appellees and Cross-Appellants.

Second District   No. 82—1044

Opinion filed March 8, 1984.

Tyrone C. Fahner, Attorney General, of Chicago, *pro se* (Lawrence K. Sezer and Marty J. Haxel, Assistant Attorneys General, of counsel), for appellant.

Peter Alexander of Martenson, Donohue & Alexander, P.C., of Rockford, for appellees.

JUSTICE HOPF delivered the opinion of the court:

This is a civil action in which the Illinois Attorney General filed a complaint against defendants, Thomas L. Walsh and Eather M. Woolbright, alleging they had violated the Consumer Fraud and Deceptive Business Practices Act (the Act) (Ill. Rev. Stat. 1977, ch. 121½, par. 261 *et seq.*). The circuit court of Winnebago County found defendants guilty of violating the Act and ordered defendant Woolbright to pay a $5,000 penalty and restitution. On appeal, the

State urges that the trial court erred in limiting the class that would be eligible to obtain restitution from Woolbright and erred in allowing Woolbright to retain uncollected profits.

Defendant Woolbright has filed a cross-appeal urging that the court erred in determining that his activities fall within the scope of the Act, and erred in assessing penalties and restitution.

On July 30, 1979, the Attorney General filed a complaint which alleged that defendants had violated the Act (Ill. Rev. Stat. 1977, ch. 121½, par. 261 *et seq.*) by selling interests in a plan known as the "Circle of Platinum." Under this plan, a person would purchase a list of six names, paying $500 to the seller and $500 to the person whose name was first on the list. The purchaser then made two copies of a new list, on which his or her own name was added as sixth, the name which had been first was eliminated, and each other name was moved up one position. The purchaser then attempted to sell these two lists to two new people who were told to repeat the process. The plan thus represented that, for an investment of $1,000, a person could make profits of up to $32,000 from an endless chain of recruiting additional purchasers.

The complaint brought by the State sought issuance of an injunction, appointment of a receiver to collect and distribute money defendants received from this scheme, and assessment of a penalty against defendants.

Defendants refused to answer the Attorney General's initial request for discovery, asserting their fifth amendment privilege against self-incrimination. Defendants were granted immunity on motion of the Winnebago County State's Attorney, but continued to refuse to present any information. This court upheld the trial court's order requiring defendants to comply with the Attorney General's discovery requests and holding defendants in contempt for their failure to comply. *People ex rel. Scott v. Walsh* (1980), 89 Ill. App. 3d 831, 412 N.E.2d 208.

After taking defendants' discovery depositions, the Attorney General moved for summary judgment. This motion was denied, and an evidentiary hearing was held. However, Walsh's debts were discharged in bankruptcy and subsequent proceedings were conducted solely as to Woolbright. On September 10, 1982, the trial court entered an order finding that the sale by Woolbright of interests in the pyramid scheme constituted a violation of the Act. Woolbright was enjoined from further participation in the plan, ordered to pay a $5,000 penalty, and ordered to pay $19,500, his total profits, to a receiver. The Attorney General was to act as a receiver and distribute this

money as restitution to claimants, as provided by statute (Ill. Rev. Stat. 1979, ch. 121½, par. 268). On Woolbright's motion the trial court modified this order on December 1, 1982, such that Woolbright was required to pay restitution only in the amount necessary to compensate those persons who had lost money due to involvement in the plan and had either purchased from Woolbright or paid money to him. The court noted that there was no just reason to delay enforcement or appeal of the order.

The Attorney General has appealed from this judgment insofar as it limits the class of claimants and allows Woolbright to keep any unclaimed portion of his profits from the scheme. Woolbright has filed a timely notice of cross-appeal (87 Ill. 2d Rules 12, 303), objecting to the finding of a violation of the Act and the assessment of penalties.

■ The first issue we consider on appeal is the question of whether Woolbright's activities violated the Consumer Fraud and Deceptive Business Practices Act (Ill. Rev. Stat. 1981, ch. 121½, par. 261 et seq.). The Act prohibits "unfair or deceptive acts or practices *** in the conduct of any trade or commerce." (Ill. Rev. Stat. 1981, ch. 121½, par. 262.) These terms are incapable of precise definition, so whether a given practice is unfair or deceptive must be determined on a case-by-case basis. (Scott v. Association for Childbirth at Home, International (1981), 88 Ill. 2d 279, 430 N.E.2d 1012; People ex rel. Fahner v. Testa (1983), 112 Ill. App. 3d 834, 837, 445 N.E.2d 1249.) However, in determining whether a practice violates the Act, a court may be guided by the standards used by the Federal Trade Commission to decide whether certain activity is violative of similar Federal law (Ill. Rev. Stat. 1981, ch. 121½, par. 262; see 15 U.S.C. sec. 45 (1976)), i.e., whether the practice offends public policy as established by statutes, the common law, or otherwise, or is within at least the penumbra of some common law, statutory, or other established concept of unfairness; whether the practice is immoral, unethical, oppressive, or unscrupulous; and whether the practice causes substantial injury to consumers or competitors. (People ex rel. Fahner v. Hedrich (1982), 108 Ill. App. 3d 83, 438 N.E.2d 924; see Federal Trade Com. v. Sperry & Hutchinson Co. (1972), 405 U.S. 233, 244-45 n.5, 31 L. Ed. 2d 170, 179-80 n.5, 92 S. Ct. 898, 905-06 n.5.) As demonstrated below, the activity at issue here meets these criteria.

In the summer of 1979 Woolbright purchased an interest in a program known as the "Money Pyramid" or "Circle of Platinum." The plan involved purchasing a list of six names for $1,000, of which $500 was paid to the person whose name appeared first on the list and $500 was paid to the immediate seller. The purchaser then made two

new lists, adding his or her name as sixth, moving each other name up one position, and eliminating the name which had been first. These two new lists were then to be sold with the same instructions. Woolbright approached several others in an attempt to sell his two lists and ultimately succeeded in doing so. Although he apparently sold his two lists at his restaurant, Woolbright hosted and attended several parties held for the purpose of explaining the plan and obtaining new participants. This was a typical method of selling the lists. At these parties, and on other occasions, Woolbright spoke to others about the pyramid scheme. He stated that he discussed the list with more than 500 people. Although Woolbright indicated that there was a possibility of losing the initial $1,000 he also stated that this "investment" could be recouped when the participant sold his or her two lists. Woolbright represented that although there was no guarantee there was also a great potential for gain, with receipts beginning when the participant's name reached the number one position on circulating lists. While Woolbright claimed that the people he dealt with did not expect exorbitant gains, Woolbright told people that the plan worked and repeated, without investigating their veracity, various stories of great success with the plan. As the plan contemplated that the number of circulating lists would double at each step, it was held out to be possible to make up to $32,000 just by the sale of two lists. Woolbright testified that the DeKalb, LaSalle and Rockford newspapers covered the story of people who had bought the lists. One such article stated that a State's Attorney had stated that as long as the lists were not carried through the mail it was not mail fraud. Copies of the article were passed out at some of the parties. Woolbright encouraged and assisted people in his chain to sell their lists and kept track of the identity of people in the chain.

There are some facts which suggest that Woolbright was attempting to comply with the law, in that he declared his gains for income tax purposes, ceased his activities after being served with summons in this case, and had opinions from several sources, including a State's Attorney, that the plan was legal. However, Woolbright did not know whether the pyramid scheme was legal. Demand for lists admittedly dropped when the Attorney General became involved.

■ Woolbright contends on appeal that the Act (Ill. Rev. Stat. 1981, ch. 121½, par. 261 *et seq.*) is not applicable to the plan he was involved in because the participants were not "consumers" under the Act. We disagree. A person's status as a consumer is a concept related to his or her standing to sue under the Act and is irrelevant where, as here, suit is brought by the Attorney General. (*People ex*

*rel. Fahner v. Hedrich* (1982), 108 Ill. App. 3d 83, 88, 438 N.E.2d 924; see *Scott v. Association for Childbirth at Home, International* (1981), 88 Ill. 2d 279, 285, 430 N.E.2d 1012.) Further, although the participants in the pyramid scheme might not have been considered consumers under the prior version of the Act (Ill. Rev. Stat. 1971, ch. 121½, par. 261 *et seq.*) and therefore would not have been protected, the current Act protects any person damaged by unfair or deceptive business practices. (See *People ex rel. Scott v. Cardet International, Inc.* (1974), 24 Ill. App. 3d 740, 321 N.E.2d 386.) This is consistent with the broad definition of the terms "merchandise," "trade," and "commerce" in the Act as it was in effect at the time the charges were brought (Ill. Rev. Stat. 1977, ch. 121½, par. 261) and the Act's prohibition of any "deception *** in the conduct of any trade ***." (Ill. Rev. Stat. 1981, ch. 121½, par. 262.) These factors show that the legislature intended the Act to have broad applicability. (*Scott v. Association for Childbirth at Home, International* (1981), 88 Ill. 2d 279, 430 N.E.2d 1012; *People ex rel. Fahner v. Hedrich* (1982), 108 Ill. App. 3d 83, 438 N.E.2d 924.) The broad reach of the Act, and the principle that the Act is to be liberally construed to effectuate its purpose of eradicating all forms of deceptive and unfair business practices (Ill. Rev. Stat. 1981, ch. 121½, par. 271a; *Perlman v. Time, Inc.* (1978), 64 Ill. App. 3d 190, 198, 380 N.E.2d 1040), indicate that the Act is applicable to the issue here.

■ Additionally, we believe the Attorney General has established that Woolbright's activities in the "Circle of Platinum" were violative of the Act. This is true regardless of Woolbright's assertions that he did not make misrepresentations concerning the plan, as the key consideration is the effect of Woolbright's conduct, not his intent. (*Grimes v. Adlesperger* (1978), 67 Ill. App. 3d 582, 585, 384 N.E.2d 537; *American Buyers Club of Mount Vernon, Illinois, Inc. v. Honecker* (1977), 46 Ill. App. 3d 252, 259, 361 N.E.2d 1370.) Similarly a practice may be unlawful "whether any person has in fact been misled" (Ill. Rev. Stat. 1977, ch. 121½, par. 262; *Brooks v. Midas-International Corp.* (1977), 47 Ill. App. 3d 266, 273, 361 N.E.2d 815), thus the fact that no one ever complained to Woolbright is not conclusive.

■ While there are no cases that have directly applied the issue presented in the case at bar, we believe the statute in question was violated. Pyramid programs, such as the "Circle of Platinum," which induce a person to participate on the representation that he or she cannot only regain the purchase price, but also reap profits by selling the plan to others, are inherently deceptive and contrary to public policy. (*Twentieth Century Co. v. Quilling* (1907), 130 Wis. 318, 324-25,

110 N.W. 174, 176; *Kugler v. Koscot Interplanetary, Inc.* (1972), 120 N.J. Super. 216, 232, 293 A.2d 682, 690-91; *State by Lefkowitz v. ITM, Inc.* (1966), 52 Misc. 2d 39, 275 N.Y.S.2d 303; *In re Holiday Magic, Inc.* (Oct. 15, 1974), 84 F.T.C. 748.) The deception arises because the market eventually becomes saturated and the seemingly endless chain must end; consequently, many participants cannot even recoup their investments, let alone make a profit. (*State ex rel. Sanborn v. Koscot Interplanetary, Inc.* (1973), 212 Kan. 668, 675-76, 512 P.2d 416, 423; 52 Misc. 2d 39, 275 N.Y.S.2d 303; *In re Holiday Magic, Inc.* (Oct. 15, 1974), 84 F.T.C. 748.) Additionally, such schemes involve aspects of a lottery, in that the controlling inducement to participate is the lure of an uncertain gain. This also renders these programs deceptive, unfair, and violative of consumer protection laws, regardless of whether criminal prohibitions against lotteries also are violated. (*Wren Sales Co. v. Federal Trade Com.* (7th Cir. 1961), 296 F.2d 456; *Gellman v. Federal Trade Com.* (8th Cir. 1961), 290 F.2d 666; *Surf Sales Co. v. Federal Trade Com.* (7th Cir. 1958), 259 F.2d 744, 746; *Wesware, Inc. v. State* (Tex. Civ. App. 1972), 488 S.W.2d 844.) Due to these considerations, marketing programs based on a pyramid principle have been found to violate other consumer protection statutes. (*State ex rel. Sanborn v. Koscot Interplanetary, Inc.* (1973), 212 Kan. 668, 675-76, 512 P.2d 416, 423; *State ex rel. Turner v. Koscot Interplanetary, Inc.* (Iowa 1971), 191 N.W.2d 624, 630; *Kugler v. Koscot Interplanetary, Inc.* (1972), 120 N.J. Super. 216, 233, 293 A.2d 682, 692-93; *Wesware, Inc. v. State* (Tex. Civ. App. 1972), 488 S.W.2d 844, 848; *In re Holiday Magic, Inc.* (Oct. 15, 1974), 84 F.T.C. 748; *cf. People ex rel. Scott v. Cardet International, Inc.* (1974), 24 Ill. App. 3d 740, 321 N.E.2d 386, where the court distinguished certain of these cases and found plaintiffs in a franchise distributorship program were not "consumers" under an earlier less pervasive revision of the Act in issue here (Ill. Rev. Stat. 1971, ch. 121½, par. 261 *et seq.*).) Consequently, we believe the "Circle of Platinum" should be found to be a violation of the Illinois Act. Contrary to defendants' suggestion this conclusion is bolstered by the Act's prohibition of chain referral sales practices which evidences a general policy against techniques of this type, a distinguishable but analogous situation. See Ill. Rev. Stat. 1981, ch. 121½, par. 262A.

Woolbright next contends that the trial court erred in assessing a $5,000 penalty against him in light of the fact that he was granted immunity. Defendants had asserted their fifth amendment privilege and refused to provide information concerning the pyramid scheme. He contends that the $5,000 fine was improper because it was based

on information he gave under immunity. In making this objection, Woolbright does not challenge the injunction or restitution order, nor could he do so. See *People ex rel. Scott v. Walsh* (1980), 89 Ill. App. 3d 831, 412 N.E.2d 208; *State ex rel. Turner v. Koscot Interplanetary, Inc.* (Iowa 1971), 191 N.W.2d 624.

Woolbright was granted immunity according to statutory provisions which permit a court, on the State's motion, to release a witness from all liability to be prosecuted or punished for any offense shown in whole or in part by any testimony or other evidence that the witness is required to produce, except perjury in the giving of such testimony. (Ill. Rev. Stat. 1981, ch. 38, pars. 106—1, 106—2.) The statute thereby grants transactional immunity, which gives the witness full protection from prosecution for any offenses to which the compelled testimony relates. *People ex rel. Cruz v. Fitzgerald* (1977), 66 Ill. 2d 546, 363 N.E.2d 835; *In re Cook County Grand Jury* (1983), 113 Ill. App. 3d 639, 447 N.E.2d 862.

■ The fifth amendment protects the individual against penalties imposed as part of the punishment for crime. The privilege does not extend to penalties of a noncriminal nature. (*United States v. Apfelbaum* (1980), 445 U.S. 115, 124, 63 L. Ed. 2d 250, 259, 100 S. Ct. 948, 954.) Immunity is similarly limited to penalties. (*In re Schwarz* (1972), 51 Ill. 2d 334, 282 N.E.2d 689, *cert. denied* (1972), 409 U.S. 1047, 34 L. Ed. 2d 499, 93 S. Ct. 527; *People ex rel. Scott v. Walsh* (1980), 89 Ill. App. 3d 831, 412 N.E.2d 208.) Therefore, in order to determine whether the grant of immunity to Woolbright precludes imposition of the $5,000 fine, we must decide the issue expressly left unresolved in *People ex rel. Scott v. Walsh* (1980), 89 Ill. App. 3d 831, 412 N.E.2d 208, *i.e.*, whether this penalty is civil, as opposed to criminal, in nature.

■ We believe it is notable that the legislature has specifically labeled the penalty authorized under the Act as a civil penalty. (Ill. Rev. Stat. 1981, ch. 121½, par. 267; see *United States v. Ward* (1980), 448 U.S. 242, 65 L. Ed. 2d 742, 100 S. Ct. 2636; *People v. Superior Court* (1974), 12 Cal. 3d 421, 525 P.2d 716, 115 Cal. Rptr. 812.) Additionally, the Act is a regulatory and remedial provision designed to protect the public; a penalty may be imposed as an aid to enforcement of the regulatory scheme, but this does not render the Act a penal statute. (*Scott v. Association for Childbirth at Home, International* (1981), 88 Ill. 2d 279, 430 N.E.2d 1012; see *People v. Superior Court* (1974), 12 Cal. 3d 421, 525 P.2d 716, 115 Cal. Rptr. 812; *State ex rel. Turner v. Koscot Interplanetary, Inc.* (Iowa 1971), 191 N.W.2d 624.) Under the circumstances, the penalty here is civil, rather than criminal, in na-

ture (*City of Monmouth v. Pollution Control Board* (1974), 57 Ill. 2d 482, 313 N.E.2d 161), and the grant of immunity does not bar imposition of the fine. *Napolitano v. Ward* (7th Cir. 1972), 457 F.2d 279, *cert. denied* (1972), 409 U.S. 1037, 34 L. Ed. 2d 486, 93 S. Ct. 512.

■ The next issue to be considered concerns the question of whether, as the Attorney General contends, the trial court erred in limiting its order for restitution so that Woolbright was required to pay only the amount claimed by persons who actually had paid money to Woolbright in the pyramid scheme.

Woolbright obtained $21,500 from his participation in the pyramid scheme. Apparently the trial court excluded the cost of the two lists purchased by Woolbright, and concluded that Woolbright's profits from this activity amounted to $19,500. Initially, Woolbright was ordered to pay this entire amount to the receiver who, after distribution to claimants, was to pay any unclaimed surplus into the State's general revenue fund. However, the court subsequently modified its order such that Woolbright was required to make payments, up to a maximum of $19,500, only as necessary to compensate actual claimants. Further, the class of potential claimants was limited basically to those persons who had given money to Woolbright as part of the pyramid scheme and had lost money due to their involvement in the plan. The Attorney General objects to the modification of the judgment, arguing it would permit Woolbright to keep any unclaimed portion of his receipts and prevent recovery by persons in Woolbright's chain who lost money.

The Act provides that where a receiver is appointed, he or she shall have the power to collect all the money and property derived by means of practices which are prohibited by the Act. (Ill. Rev. Stat. 1981, ch. 121½, par. 268.) Although we have found no case law on point, this statutory language suggests that Woolbright should be required to turn over all of the $19,500 he obtained as profits from participation in the pyramid, regardless of whether this entire amount is claimed.

The Act also provides that any person who has suffered damages as a result of the use of any unlawful practice may particate in the receiver's distribution of assets to the extent of out-of-pocket losses. (Ill. Rev. Stat. 1981, ch. 121½, par. 268.) Again, there appears to be no case law interpreting this statute as relevant to the inquiry here. However, the clear language of this provision suggests that any person who lost money due to participation in the pyramid scheme and can trace his or her involvements to Woolbright should be entitled to share in the recovery and that the class of claimant should not be lim-

ited just to those people who personally gave money to Woolbright.

■ The trial court limited potential claims to those persons who purchased from Woolbright and lost money due to their inability to resell and to those persons who purchased from others, if they could show that Woolbright received $500 as a result of their purchase, and who lost money due to their involvement in the pyramid plan. As the two people who purchased their lists directly from Woolbright in turn sold their lists, this latter group represents the actual potential claimants. This group appears to be limited to those persons who purchased lists on which Woolbright's name appeared as number one, thus paying Woolbright $500, and then were unable to sell their lists. This is an improper limitation, especially given the nature of the activity at issue here. The persons most likely to lose money in a pyramid scheme are those at the end of the chain. (See *State ex rel. Sanborn v. Koscot Interplanetary, Inc.* (1973), 212 Kan. 668, 512 P.2d 416; *State by Lefkowitz v. ITM, Inc.* (1966), 52 Misc. 2d 39, 275 N.Y.S.2d 303.) These people are the ones who suffered damage as a result of this unfair practice, so as to fall within the class of claimants set forth in the statute. (See Ill. Rev. Stat. 1981, ch. 121½, par. 268.) However, these people conceivably could have purchased a list which, while originally emanating from Woolbright, no longer contained his name. Given the statutory language, such persons also should be able to make claims against the fund ordered to be paid by Woolbright to the receiver. This result can be achieved by modification of the trial court's order, as opposed to remand. By way of modification we believe that the class of claimants must include persons who purchased an interest in the pyramid scheme who can trace their list to one sold by Woolbright, and thereby lost money due to their participation in the plan.

In limiting potential claimants and allowing Woolbright to keep unclaimed portions of his profits, the trial court may have been considering the fact that Woolbright was not the person who initiated the "Circle of Platinum" and could be viewed as merely one of many participants in the chain. (Compare *Kugler v. Koscot Interplanetary, Inc.* (1972), 120 N.J. Super. 216, 293 A.2d 682.) While this is a mitigating factor, Woolbright is not being unfairly treated as the amount he must pay as restitution is limited to the amount of gain he received. Additionally, there is a basis for holding Woolbright responsible for people in his chain with whom he did not deal directly, as Woolbright encouraged and assisted the sale of lists in his chain and he was aware that some people would lose money due to this scheme.

The judgment of the trial court is affirmed in part, but modified

to require that Woolbright make payment of the full $19,500 to the receiver and to broaden the group of potential claimants as set forth in this opinion.

Affirmed in part, and modified in part.

SEIDENFELD, P.J., and VAN DEUSEN, J., concur.