**PEOPLE OF THE STATE OF ILLINOIS ex rel. Neil F. HARTIGAN, Attorney General of Illinois, Plaintiff,**

v.

**COMMONWEALTH MORTGAGE CORPORATION OF AMERICA, et al., Defendants.**

**Federal Savings and Loan Insurance Corporation, etc., Intervenor.**

**No. 89 C 2752.**

United States District Court, N.D. Illinois, E.D.

Feb. 1, 1990.

---

Neil F. Hartigan, Atty. Gen. of Ill., and Kathleen Dravillas, Asst. Atty. Gen., Chicago, Ill., for plaintiff.

Leon E. Lindenbaum, Lindenbaum Coffman Kurlander Brisky & Hayes, Ltd., Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

As described in this Court's "Opinion" (723 F.Supp. 1258 (N.D.Ill.1989)),[1] Illinois Attorney General Neil Hartigan initially filed a two-count Complaint in the Circuit Court of Cook County on behalf of the People of the State of Illinois against Com-

monwealth Mortgage Corporation of America ("Commonwealth")—a wholly-owned subsidiary of Commonwealth Savings Association ("Association")—and certain of Commonwealth's officers, alleging violations of:

    1.  the Consumer Fraud and Deceptive Business Practices Act, Ill.Rev.Stat. ch. 121½, ¶¶ 261–272 ("Consumer Fraud Act") in Count I and

    2.  the Uniform Deceptive Trade Practices Act, *id.* ¶ 312 ("Deceptive Practices Act") in Count II.[2]

On March 8, 1989 Federal Home Loan Bank Board appointed Federal Savings and Loan Insurance Corporation ("FSLIC") as Association's conservator and Federal Deposit Insurance Corporation ("FDIC") to provide management services for FSLIC's conservatorship. FSLIC then intervened to supplant Commonwealth as defendant in this action and removed it to this District Court.

Because the Complaint seeks restitution of certain sums from FSLIC as intervenor defendant, Opinion at 1261–62 held that plaintiff could not, under the doctrine announced in *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942) and extended in *Langley v. FDIC*, 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987), ground any fraudulent-representation recovery upon Commonwealth's asserted oral misrepresentations—or indeed even *written* misrepresentations—that were not contained in official Commonwealth records. Instead plaintiff would have to prove his case using written evidence in Commonwealth's files showing that Commonwealth had placed limitations on the enforceability of its loan promises that amounted to fraud.

FSLIC and Commonwealth then moved under Fed.R.Civ.P. ("Rule") 56 for summary judgment.[3] Plaintiff has responded in

---

**1.** Further citations to the Opinion will refer only to the page number, omitting the F.Supp. volume number.

**2.** All future citations to provisions of the Consumer Fraud Act or the Deceptive Practices Act will simply refer to "Section—," omitting the statutory chapter number. That use of "Sec-

tion" rather than "Paragraph" conforms to the Illinois General Assembly's usage rather than that employed by the publisher of the Smith–Hurd annotated version.

**3.** Because (as indicated at the outset of this opinion) there are also some individual defendants targeted by plaintiff's Complaint, it would

skeletal terms with a few items of evidence and a brief memorandum. Because that submission falls woefully short of raising any issue of material fact, this Court grants FSLIC's motion for summary judgment.

### PLAINTIFF'S COUNT I CLAIMS [4]

Plaintiff grounds Count I on Section 262, which reads in part:

Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

Section 2 of the Uniform Deceptive Trade Practices Act (codified as Section 312) declares numerous activities deceptive, including the following activities specifically cited by plaintiff:

A person engages in a deceptive trade practice when, in the course of his business, vocation, or occupation, he:

\* \* \* \* \* \*

(2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services;

(3) causes likelihood of confusion or of misunderstanding as to affiliation, connection or association with or certification by another;

\* \* \* \* \* \*

(5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have;

\* \* \* \* \* \*

(9) advertises goods or services with intent not to sell them as advertised;

(10) advertises goods or services with intent not to supply reasonably expectable public demand, unless the advertisement discloses a limitation of quantity;

\* \* \* \* \* \*

(12) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

In order to prevail in an action under this Act, a plaintiff need not prove competition between the parties or actual confusion or misunderstanding.

Although plaintiff originally recited 11 acts or practices of Commonwealth claimed to violate the Consumer Fraud Act (see Opinion at 1260), once this Court issued its *D'Oench–Langley* ruling plaintiffs had to narrow their misrepresentation claims to those supported by official Commonwealth records. With the benefit of discovery of documents in Commonwealth's files, P. Mem. 5–6 has now narrowed plaintiff's claims to four in all:

[1] Defendants represented to certain consumers that the consumers would receive their loan within a certain period of

---

be potentially misleading to describe the current movants by the collective term "defendants." Instead this opinion will, purely in the interests of simplicity, use "FSLIC" to identify both movants (who are represented by the same counsel).

**4.** Opinion at 1259 n. 1 raised a still-unanswered question as to plaintiff's standing to assert the Count II claims on behalf of either the "People" or the 50 loan applicants who were actually touched by the complained-of activity—as pointed out there, Section 313 grants relief only to

"[a] person likely to be damaged by a deceptive trade practice of another." Nevertheless, because all parties agree that Count II raises no issues and seeks no remedies not already encompassed by Count I (indeed, violations of the Deceptive Practices Act are actionable under the Consumer Fraud Act as well as independently), this Court again need not address that jurisdictional issue. Once plaintiff's Count I claims fall to defendants' summary judgment motion on the merits, the Count II claims succumb as well.

time when defendants could not have reasonably expected to close the loan within that time period ["Claim 1"].

[2] Defendants represented to certain consumers that the consumers loan application would be processed diligently ... but failed to process the loan applications diligently ["Claim 2"].

[3] Defendants continued to advertise, offer and guarantee that they could close loans within a certain time period after they knew or should have known their ability to close the loans within the time period was unlikely or impossible ["Claim 3"].

[4] Defendants failed to maintain a full service office and staff reasonably adequate to handle efficiently all communication, questions and other matters related to consumers having (sic) mortgage applications ["Claim 4"].

For purposes of the current motion, Claims 1–3 are conceptually similar: Each asserts actionable misrepresentations by Commonwealth. That common ingredient is absent from Claim 4, which asserts neither promises nor misrepresentations by Commonwealth. Accordingly this opinion will first address whether plaintiff's misrepresentation claims survive FSLIC's summary judgment motion, then will turn to plaintiff's Claim 4.

## MISREPRESENTATION CLAIMS

*Wheeler v. Sunbelt Tool Co.*, 181 Ill. App.3d 1088, 1108, 130 Ill.Dec. 863, 877, 537 N.E.2d 1332, 1346 (4th Dist.1989) (citation omitted) recently spelled out the elements of an action under the Consumer Fraud Act:

In order to establish a violation of the Consumer Fraud Act, plaintiff must show: (1) a deceptive act or practice; (2) an intent by defendants that plaintiff rely on the deception; and (3) the deception must have occurred in the course of conduct involving a trade or commerce.

Here no one challenges the assertion that the claimed misrepresentations, if established, would have "occurred in the course of conduct involving a trade or commerce." In addition, no problem is posed by the fact that the original defendants' intent has not been put into issue on the current motion: This Court need not now decide whether those defendants (including Commonwealth) acted with any *fraudulent* intent or, indeed, whether any proof of such intent is actually necessary to establish a Consumer Fraud Act violation.[5] Instead the current focus is on whether plaintiff has met his burden, sufficient to withstand FSLIC's summary judgment motion, to show:

1. that the kinds of misrepresentation asserted are actionable under the Consumer Fraud Act and

2. that evidence properly adduced pursuant to this Court's *D'Oench–Langley* ruling supports an inference that Commonwealth in fact made misrepresentations in violation of the Consumer Fraud Act.[6]

As to the first inquiry, there is no question but that the Consumer Fraud Act is applicable to the claimed misrepresenta-

---

**5.** On that score it is worth remembering that a summary judgment motion is usually a difficult context in which to determine questions of intent. On the other hand, most Illinois courts that have faced the issue squarely have held that the statutory reference to misrepresentation or concealment "with intent that others rely upon the concealment ..." is merely illustrative and that neither intent nor reliance is an independent element of a claim under the Consumer Fraud Act. As *Munjal v. Baird & Warner, Inc.*, 138 Ill.App.3d 172, 182–83, 92 Ill.Dec. 809, 818, 485 N.E.2d 855, 864 (2d Dist.1985) (citations omitted) summarized:

[U]nder the Act, it is not necessary for a plaintiff to show actual reliance nor diligence in ascertaining the accuracy of the misstate-

ments. Moreover it has been held that the good or bad faith of the seller is irrelevant under the Act; consequently, a plaintiff can recover for even innocent misrepresentations.

**6.** Familiar Rule 56 principles impose on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)). For that purpose this Court is called on to draw all "reasonable inferences, not every conceivable inference" in the light most favorable to the nonmovant—in this case plaintiff (*DeValk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 329 (7th Cir. 1987)).

tions. Even a brief survey of the numerous cases in which courts applying Illinois law have addressed the question whether an act or practice is deceptive shows that the vast bulk of cases decided under the Consumer Fraud Act have arisen out of the same kinds of false promises and misrepresentations that plaintiff claims. For example, *American Buyers Club of Mt. Vernon, Illinois, Inc. v. Honecker*, 46 Ill.App.3d 252, 258–59, 5 Ill.Dec. 666, 670, 361 N.E.2d 1370, 1374 (5th Dist.1977) held that a sewing machine club engaged in deception by affirmatively misleading plaintiffs into believing they could obtain a Singer brand machine at the club's discounted price when in fact they could not. Similarly, *Crowder v. Bob Oberling Enterprises, Inc.*, 148 Ill.App.3d 313, 316–17, 101 Ill.Dec. 748, 751, 499 N.E.2d 115, 118 (4th Dist. 1986) held that selling a used car without disclosing that the car had once been in a salvage condition was Consumer–Fraud–Act actionable, even in the absence of any affirmative misrepresentation, as a deceptive omission of material fact. In addition, as shown by the Consumer Fraud Act's incorporation of provisions of the Deceptive Practices Act, statements or omissions that would tend to confuse consumers as to the nature of services supplied by Commonwealth would, if established, be actionable as well.

Where plaintiff's claims of misrepresentation fail instead is that he has proffered no evidence whatever tending to support those claims. Plaintiff initially complained of unfair or deceptive practices assertedly encountered by 50 of Commonwealth's borrowers. In response to the current motion, however, plaintiff now asserts claims with respect to only 4 of those 50 borrowers, supported by a total of seven documents said to evidence violations of the Consumer Fraud Act by Commonwealth. This opinion will address each in turn.

### 1. *Fouts Application.*

■ Plaintiff's search of Commonwealth's records uncovered three documents he believed related to the application of Mr. and Mrs. Fouts and were "confusing and unfair or deceptive to the consumers who thought they were locked in to a certain rate and points for 60 days when the [Veterans Administration ('VA')] forbade lock-ins" (P. Issues 2). Plaintiff first points to a standard "rate/point lock" sheet (reproduced and attached to this opinion as Exhibit 1) that he claims reflects a March 25, 1986 agreement to lock in the Fouts loan for 60 days at an interest rate of 8.5 percent and 1.5 points. However, Exhibit 1 clearly relates to a Commonwealth customer named Duffy, not to the Fouts application at all. Hence that document is irrelevant to plaintiff's claim.[7]

Plaintiff's two remaining documents as to the Fouts application are (1) a "refinance agreement" reciting a 60–day lock on a loan of $57,350 at an interest rate of 8.5 percent and "discount" of 1.75 percent and (2) a letter from Commonwealth to the VA signed by Diane M. Meeks, reading in full (and verbatim):

> The undersigned lender hereby cerifies to the VA that in connection with Loan Number LH 498–506, it made no legally binding commitment in writing to the veteran to make the loan at the rate of interest in effect for VA guaranteed on insured loans on the date of loan closing.

Although the refinance agreement does not state a loan number for the Fouts loan, defendants concede that the letter does refer to that loan.

It is unclear how plaintiff thinks those two documents establish liability under the Consumer Fraud Act, but common sense shows that they cannot establish liability on any theory. If plaintiff's only complaint is that the two documents together are confusing and somehow therefore in violation of Sections 312(2), (3) or (11), the simple answer is that plaintiff fails even to claim that the Fouts had an opportunity to see or hear of the letter directed to the VA, or even to suggest how the Fouts were

---

**7.** Even if that were not the case, Exhibit 1 would still not do the job for the same reasons as are next discussed in the text regarding the other documents that *do* bear on the Fouts application.

likely to have been confused by a letter of whose existence they never claimed to have been aware.

■ Even if the Fouts *had* seen the letter (an unjustified assumption in the absence of any evidence), the letter's assurances that Commonwealth had not executed a legally binding agreement to loan money to the Fouts at VA guaranteed rates would not support an inference that Commonwealth never intended to live up to the refinance agreement's lock-in provision. First, that provision did not represent that the locked-in rate was at the rate of interest in effect for VA guaranteed loans on the date of loan closing. More importantly, the refinance agreement explicitly disclaimed any guaranty that the loan would close within the lock-in period and therefore at the lock-in rate:

> [Commonwealth] will make every reasonable effort to complete all processing and approval requirements within the 60 day locked period; however, due to current conditions relative to obtaining appraisals, credit reports, etc., we cannot guarantee the completion of the processing of the application within 60 days.

Finally, plaintiff has not claimed that Commonwealth never intended to make "every reasonable effort" to process the Fouts' loan within the lock period, or failed to make such efforts, or even actually failed to process that loan within the lock period. In short, plaintiff has failed to bring forth any evidence relating to the Fouts application tending to show the kind of confusion or misrepresentation that is actionable under the Consumer Fraud Act or the Deceptive Practices Act.

### 2. *Teasley Application.*

■ Plaintiff also found among Commonwealth's official records a "processing flow sheet" for the application by Mr. and Mrs. Timothy Teasley that recites among other things, that (1) the Teasleys filed their application on March 29, 1986,[8] (2) the

appraisal was ordered April 23 (25 days later) and (3) the appraisal was received on June 16 (54 days after it was ordered, 79 days after the Teasleys' loan application and thus 19 days after the lock would have expired). Plaintiff's only complaint about the events reflected in the processing flow sheet is that Commonwealth has tendered "no explanation" for the 25–day delay in ordering an appraisal.

As with the documents relating to the Fouts application, plaintiff does not assert that the proffered processing flow sheet was ever in the hands of the Teasleys or that they were aware of its existence. That fact, in addition to the fact that the document nowhere makes any representations as to when any of the activities there recorded would be completed, eliminates any claim plaintiff might assert on the basis of that document for actionable misrepresentations.

### 3. *Olson Application.*

■ Commonwealth's files also contained an unsigned handwritten note, apparently written by one of Commonwealth's loan officers, relating to the Olson application. After detailing the dates on which the application was submitted and the appraisals and other documentation were ordered, the note described the events that led to the inadvertent expiration of Mr. and Mrs. Olson's lock-in period (again the document is quoted verbatim):

> When I notified the Olson's that they had loan approval, they asked when the best time to close was. Not realizing that the lock expired on 4/3/87, I told them that the end of the month was because they would get a little more cash back because of less interest to the end of the month. They agreed that they were to close at the end of the month. When we realized that the lock expired, they did not want to close at a higher rate.

---

8. All further dates that omit the year will refer to dates in 1986. Although P. Issues 2–3 says the application was received on March *19,* the processing flow sheet states in at least two places (actually nine, counting all the entries for

the numerous documents and fees submitted contemporaneously with the application) that the application was in fact submitted on March 29.

While that note may evidence the negligence of one of Commonwealth's loan officers, it cannot be used to establish any misrepresentation by that officer actionable against FSLIC. Even assuming plaintiff could claim that Commonwealth violated the Consumer Fraud Act when the loan officer represented (as it later turned out, falsely) that the "best" date to close would be at the end of the month,[9] under *D'Oench, Duhme* the proffered note is not admissible to prove such a representation. As codified in 12 U.S.C. § 1823(e), the *D'Oench, Duhme* doctrine says evidence of any misrepresentation:

> (1) shall be in writing, (2) shall have been executed by the bank and the person or persons claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the bank, (3) shall have been approved by the board of directors of the bank or its loan committee, which approval shall be reflected in the minutes of said board or committee, and (4) shall have been, continuously, from the time of its execution, an official record of the bank.

Obviously the misrepresentation referred to in the note, if such it was, does not qualify as evidence against FSLIC because it was not signed by either the bank officer or the Teasleys, was not "approved" by any Commonwealth committee (let alone its board of directors) and was not created contemporaneously with the making of the representation.

### 4. *Gor Application.*

Finally, plaintiff found in Commonwealth's official records an internal memorandum from La Vonne Mezger to Joe Miller explaining why the lock given to Greta Gor had expired. That document reads in part (ellipsis in original):

> The reason the points expired is due to lack of followup by the processor and loan officer to reorder payoffs, etc. Again, how does one explain incompetence? I wish there was another way of putting it, but nothing will suffice. Sorry ... The errors were due to Barbara Adams and Gayle Vant the processor.

Again, plaintiff's evidence fails for two reasons. First, the proffered document—unsigned by Ms. Gor and created not only after the lock expired but also long after the lock would have been initially given—is not in the form required by *D'Oench, Duhme*. Even if those defects were not present, however, nowhere in the document does any Commonwealth officer ever make or acknowledge having made any representations (let alone any false representations) to Ms. Gor whatever as to her lock-in provision.

\* \* \*

In sum, plaintiff has failed to produce any documentary evidence raising a genuine issue of material (that is, outcome-determinative) fact as to any of his claims of misrepresentations by officers or employees of Commonwealth. Accordingly, FSLIC's motion for summary judgment relating to those claims must be and is granted.

### NON–MISREPRESENTATION CLAIM

FSLIC dismisses plaintiff's final remaining claim out of hand by noting (1) that it asserts no misrepresentation by Commonwealth and (2) that *Graphic Sales*, 824 F.2d at 580 (quoting, among other cases, *General Motors Acceptance Corp. v. Grissom*, 150 Ill.App.3d 62, 103 Ill.Dec. 447, 501

---

9. On that score it is additionally clear that such a statement would not qualify as a representation of "material fact"—something consistently held necessary in Consumer Fraud Act misrepresentation cases such as *Graphic Sales, Inc. v. Sperry Univac Division, Sperry Corp.*, 824 F.2d 576, 580 (7th Cir.1987) and cases there cited. In the first place, stating the "best" date for closing is a statement of opinion, not one of fact. Second, if the representation were sought to be characterized as a factual statement that closing at the end of the month would save on interest accruing during the course of the month, while at the same time failing to disclose the material fact that the lock would expire before then, such omission could hardly be material where (1) Commonwealth had previously made full disclosure of the terms of the rate/point lock and (2) the Teasleys, if they had referred to the earlier document, would have been fully aware of the loan officer's error.

N.E.2d 764 (5th Dist.1986)) said (footnote omitted):

> While there is significant Illinois authority for the proposition that the defendant's intent is not an element of a cause of action under the Act, it is clear that the plaintiff must establish that the defendant made a misrepresentation of material fact.

FSLIC concludes that an alleged failure to maintain an adequate office and staff would not violate the Consumer Fraud Act.

But that conclusion is not so self-evident. Analysis demonstrates that if plaintiff had satisfied his evidentiary burden in response to the current Rule 56 motion, that non-misrepresentation claim might well have survived summary disposition. It is true that plaintiff's total failure of proof on that score renders any substantive discussion of the issue dictum. Nonetheless FSLIC's mischaracterization of the legal issue seems to this Court to call for correction.

■ Although (as previously noted) most Consumer Fraud Act cases do involve misrepresentations or omissions, FSLIC's position overextends the reach of *Graphic Sales*. That case does *not* say (or even necessarily imply) that *no* action is possible under the Consumer Fraud Act absent an alleged misrepresentation. Instead the quoted language accurately states the proposition that *if* plaintiff's claim under the Act is grounded upon a misrepresentation, it must be of a material fact. Nothing in that opinion, nor any other cited by FSLIC, teaches that the Consumer Fraud Act is inapplicable absent a misrepresentation.

On the contrary, this Court has uncovered several cases that plainly signal that violations of the Consumer Fraud Act are possible even absent any misrepresentations. Thus *People ex rel. Fahner v. Walsh*, 122 Ill.App.3d 481, 486, 77 Ill.Dec. 691, 695, 461 N.E.2d 78, 82 (2d Dist.1984) found a pyramid scheme to be deceptive even if the originator of the scheme made no misrepresentations about the scheme or the risks. *People ex rel. Hartigan v. Stianos*, 131 Ill.App.3d 575, 580–81, 86 Ill.Dec. 645, 649–50, 475 N.E.2d 1024, 1028–29 (2d Dist.1985) held, without any mention of misrepresentations at all, that a retail store's practice of charging excessive sales tax was deceptive and unfair even if the excess sums collected were actually turned over to the state taxing authorities. *People ex rel. Fahner v. Hedrich*, 108 Ill. App.3d 83, 89–90, 63 Ill.Dec. 782, 788–89, 438 N.E.2d 924, 928–29 (2d Dist.1982) held that a mobile home park committed an unfair practice by not allowing residents of the park to sell their homes without paying a large transfer fee, while providing essentially no services related to the transfer. *Hedrich* noted that the offense was compounded by the park owner's failure to disclose the transfer fee policy until the residents attempted to sell their homes, but implied that the practice would have been unfair even without that additional fact.

Holding that the Consumer Fraud Act reaches practices other than misrepresentations does not at all conflict with the plain language of the Act, which provides remedies for "unfair *or* deceptive" practices. Because the statute's use of the disjunctive indicates that some practices may be unfair without being deceptive, it is a fair inference that the Consumer Fraud Act may bar some practices other than misrepresentations or omissions, both of which would necessarily involve deception. At the same time, such a holding would comport with the frequently-repeated policy that the Act should be "liberally construed" to effect its remedial purposes (Section 271a).

Perhaps most importantly, Section 262 concludes by saying:

> In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act.

In light of that sentence, Illinois courts (see, e.g., *People ex rel. Fahner v. Walsh*, 122 Ill.App.3d at 484, 77 Ill.Dec. at 694, 461 N.E.2d at 81) have frequently looked to the factors applied by the FTC and described in *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244–45 n. 5, 92 S.Ct. 898, 909–10 n. 5, 31 L.Ed.2d 170 (1972) (quoting 29 Fed.Reg. 8355 (1964))—factors used in determining

when a nondeceptive practice may nevertheless be unfair:

> (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen).

Such cases as *Spiegel, Inc. v. FTC*, 540 F.2d 287 (7th Cir.1976) exemplify the wide sweep of those factors. There the court held that FTC Act § 5 conferred power on the FTC to enjoin a retailer from suing its far-flung mail-order customers in the retailer's home state. Even assuming that the Illinois long-arm statute allowed such suits, the Court of Appeals said that bringing suit anywhere other than in the customer's home state was an unfair practice.

But as was said at the outset of this discussion, all this analysis is really beside the mark. Rule 56(e) mandates what a party in plaintiff's position must do when confronted with a motion such as FSLIC's:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

And that clear mandate has been echoed by the Supreme Court in *Celotex*, 477 U.S. at 322–24, 106 S.Ct. at 2552–53.

■ In response to FSLIC's summary judgment motion, plaintiff filed a Statement of Genuine Issues, accompanied only by the documents already discussed bearing on the asserted misrepresentation claims, together with an eight-page memorandum in support of plaintiff's response. Nothing was said in any of those documents as to plaintiff's non-misrepresentation claim other than a wholly naked reference to Complaint ¶ 10(h) at P. Mem. 6. That reliance on a mere pleading is totally insufficient to satisfy the crystal-clear directive of Rule 56(e) and *Celotex*. Plaintiff's Claim 4 assertion must also succumb.

## CONCLUSION

There is no genuine issue of material fact, and FSLIC and Commonwealth are entitled to a judgment as a matter of law. Accordingly this action is dismissed with prejudice as to both FSLIC and Commonwealth, and under the authority of *National Metalcrafters v. McNeil*, 784 F.2d 817, 820–21 (7th Cir.1986) this Court expressly determines that there is no just reason for delay and expressly directs the entry of a final judgment in favor of FSLIC and Commonwealth and against plaintiff. Because that disposes of the only federal-question claim in this action, this Court declines to entertain plaintiff's remaining claim against Commonwealth's officers (see *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966)) and remands this action to the Circuit Court of Cook County (see 28 U.S.C. § 1447(c)). There is no reason to delay that remand as this District Court's General Rule 30(b) permits, and this Court directs that the certified copy of the remand order be mailed forthwith.

EXHIBIT 1 (15)

RATE/POINT LOCK

LOAN NO: 214.018          NAME: Duffy

INVESTOR:          CDW.

LOAN AMOUNT: $ 125,000     TERM: 180 (MONTHS)

INTEREST: 9.0 %     DATE LOCKED: 3/25

EXPIRATION DATE: 60 days

POINTS: 4 H     DATE LOCKED: 3-24-86

EXPIRATION DATE: $ -5-22-86

STREET PRICE: 4 +1

PROCESSOR: Gayle

BRANCH OFFICE: Lombard

ENTERED BY: PD.

JHC:01-501

EXHIBIT
B